Roosevelt P. DUNCAN

v.

STATE OF MARYLAND and University of Maryland at Baltimore City et al.

Howard P. RAWLINGS

v.

STATE OF MARYLAND and University of Maryland at Baltimore County.

Civ. A. Nos. M–76–1650, M–74–826.

United States District Court,
D. Maryland.

Feb. 3, 1978.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This memorandum addresses the four pending motions in *Duncan* :

1. Motion to Consolidate *Duncan* with *Rawlings*. Paper 21.
2. Motion to Certify Class in consolidated cases. Paper 20.
3. Motion of plaintiff to compel. Paper 22.
4. Motion of Defendant to compel. Paper 24.

In addition, the following motions are outstanding in *Rawlings* :

5. Motion to strike class allegations. Paper 4.
6. Motion to certify class. Paper 6.
7. Motion of plaintiff to compel answers to interrogatories. Paper 14.
8. Motion of defendant for protective order. Paper 20.

The decision on all motions depends largely (1) on the relationship between the Baltimore City Campus (*UMAB*) and the Baltimore County Campus (*UMBC*) and (2) on the relationship between "associate staff," *e. g.* librarians, administrators, *et al,* such as plaintiff Duncan and faculty positions, such as plaintiff Rawlings. These relationships must be judged separately by the separate standards of Rule 42 and Rule 23, but determination of what the relationships are in fact is the initial task here.

### I

### MOTION TO CONSOLIDATE

#### A. UMAB v. UMBC

■ The University of Maryland at Baltimore and the University of Maryland at Baltimore County are geographically separate campuses of the University of Maryland. Each campus now has its own chancellor who reports directly to the President of the University. *See* Ex. 4, Baril Dep., Paper 30 in C.A. M–76–1650 [hereinafter Baril Dep.]; Baril Dep. 7; Ex. A, Baratz Aff., Paper 4 in C.A. M–74–826 [hereinafter Baratz Aff.]; Ex. C, Hornbake Aff., Paper

Kenneth L. Johnson, Baltimore, Md., for Roosevelt P. Duncan and Howard P. Rawlings.

Michael W. Lower, Asst. Atty. Gen., Baltimore, Md., for the State of Maryland and the University of Md. at Baltimore City.

Estelle A. Fishbein, Asst. Atty. Gen., for State of Md., University of Md. at Baltimore County.

4 in C.A. M–74–826 [hereinafter Hornbake Aff.].

Substantive decisions on the employment of associate staff and faculty are made by the chancellors and department heads on each campus within the regulations made on a university wide basis. *See Personnel Policies and Rules for Associate Staff Employees of the University of Maryland* (1974), Ex. 1, Baril Dep. [hereinafter *Rules for Associate Staff*]; *Statement of Policy on Appointments and Promotions*, A Report From the Faculty Comm. on Appointments, Promotions and Salaries (1957), Ex. B, Baratz Aff.; Baril Dep. 48 (as to Duncan); Baratz Aff. 2–3 (as to Rawlings).

Each campus has a separate personnel department. These separate personnel departments have only limited responsibilities for employment decisions relating to the staff and faculty and the limited responsibility each exercises applies only to the respective campus on which it is located. *E. g.*, Baril Dep. 7; *id.* at 11–12 (UMAB personnel office does not have personnel information for other campuses); *id.* at 15 ("The only information that we supply for faculty and staff would be that information required in the payroll system"); *id.* at 21 (UMAB personnel director only familiar with practices at UMAB); *id.* at 38 (UMAB personnel office has "little, if any," contact with central university administration regarding associate staff).

Examination of the *Rules for Associate Staff* and of the *Statement of Policy on Appointments and Promotions* establish beyond doubt that the employment decisions for associate staff and faculty are made on the same campus as the employee is stationed and by the employee's administrative and academic superiors on that campus.

For these reasons, this court concludes that to the extent these plaintiffs complain about the specific employment decisions affecting them and about the standard operating procedures or practices in applying the facially neutral university-wide *Rules on Associate Staff* or *Statement of Policy on Appointments and Promotions*,[1] the controversy focuses on the individual campuses of the University, namely, the University of Maryland at Baltimore City and the University of Maryland at Baltimore County.

### B. Associate Staff v. Faculty

Responsibility for employment decisions affecting associate staff and faculty is designated by two separate manuals adopted, apparently, by two separate and distinct entities within the University.

### 1. Associate Staff

Employment decisions affecting associate staff are regulated by the *Rules for Associate Staff* which was approved by the President of the University on September 24, 1973. These rules provide that associate staff positions may be created only by the chancellor. *Id.* at 8, Part II A. The campus personnel department will recommend to the chancellor whether a new position be on the associate staff or in a classified employee system. Baril Dep. 28. Official responsibility for recommending appointments and promotions rests with the heads of departments, the deans of colleges, or the equivalent, and the recommendation must be approved by the campus chancellor. *Id.* at 9, Part II B. The primary responsibility for recruiting rests in the department. *Id.* at 14. The various departments have the authority to hire and fire. Baril Dep. 25, 34. The campus personnel office has no authority to reject an applicant for an associate staff position, *id.* at 32, although upon request it will make a recommendation. *Id.* at 33. Employment decisions are communicated to applicants by the employing department itself, not the personnel department. *Id.* at 34. Although statistical data concerning applicants and new appointees is gathered by the personnel department to assure affirmative action compliance, *id.* at

---

1. Examination of the *Rules for Associate Staff* and *Statement on Policy on Appointments and Promotions* discloses nothing which would prevent a classification of these rules as facially neutral as to race. Nor do the complaints or the proceedings to date suggest that there is a written policy of racial discrimination.

25, 34, the personnel department may never know who the applicants were by name. *Id.* at 34. As a general matter, a person could be hired onto the associate staff and never have any dealing at all with the personnel department. *Id.* at 29. The only inevitable contact by an associate staff employee with the personnel department is the payroll system. *See id.* at 15–18.

### 2. Faculty

Employment decisions affecting faculty members are regulated by the *Statement of Policy on Appointments and Promotions* approved by the University of Maryland Faculty Senate on March 5, 1957. Baratz Aff. 5. Official responsibility for recommending appointments and promotions rests with heads of departments and deans of colleges. *Statement* Pt. B. This responsibility is exercised initially through Promotion and Tenure Committees organized for each academic department or division. Baratz Aff. 1–2. These committees are primarily responsible for the evaluation of the faculty member's performance. *Id.* A report is made to the department or division head who makes the formal recommendation to the campus chancellor or vice chancellor. *Id.* at 3. Final decisions on faculty appointments and promotions are made by the campus chancellor unless the appointment makes the faculty member eligible for tenure in which case the final decision is made by the President of the University. Hornbake Aff.

The campus personnel office's only responsibility for faculty employees is to hold personnel files and process payroll. Baril Dep. at 31. Unlike the personnel office's responsibility for gathering statistics for affirmative action compliance regarding classified employees and associate staff, the campus personnel office has no responsibility for faculty affirmative action programs. *Id.* at 30–32. The Central University Personnel Committee, consisting of the personnel directors for each campus and the University Vice President for Administration, *id.* at 39, has no function whatsoever with reference to faculty. *Id.* at 40.

Both associate staff employees and faculty are characterized as "academic staff" in contrast to "classified employees" and "student employees." *See, e.g., Rules for Associate Staff* 1–7. While this joint characterization may reflect shared distinctions by the associate staff employees and faculty members, on the one hand, from the classified or student employees on the other hand, the label does not diminish the significant differences between the two kinds of academic staff.

For these reasons, the court concludes that employment practices affecting associate staff employees and those affecting faculty employees are separate and distinct and that the practices affecting each group should be considered independently. Accordingly, the court concludes that there are no common questions of fact involved in these cases brought by plaintiff Duncan, a former associate staff employee at UMAB, and by plaintiff Rawlings, a former faculty member at UMBC. The motion to consolidate will be denied. *See* F.R.Civ.P. 42(a). Likewise, there is no suggestion that the questions of law are novel or that they otherwise warrant consolidation. *See id.*

### II

### *Duncan Class Certification Motion*

With respect to plaintiff Duncan's motion to certify a class, for the reasons noted above, the motion will be denied to the extent that Duncan, a former associate staff employee at UMAB, seeks to represent faculty members at UMAB and faculty or associate staff at UMBC because there is no common question of fact. *See* F.R.Civ.P. 23(a)(2). There is no suggestion that the questions of law are novel or that they otherwise warrant consideration in the context of a class. *See id.* Furthermore, the preceding examination of the structures of the two campuses and of the two employee groups makes it clear that the kind of relief sought by plaintiff Duncan, a former associate staff member at UMAB, would not be typical of, or have common elements with, the relief which might be sought by faculty members at either UMAB

or UMBC or even by associate staff at UMBC. Accordingly, plaintiff Duncan's claim is not typical of the claims of these segments of the purported class. *See* F.R. Civ.P. 23(a)(3); *Byrd v. Local 24, I.B.E.W.,* 14 E.P.D. ¶ 7761, at 5747 (D.Md.1977), *citing, e.g.,* 7 Wright & Miller, *Federal Practice and Procedure* § 1764 (pocket supp.); 3B *Moore's Federal Practice* ¶ 23.06–Z, at 23–325 (1976 Supp.); *Gonzales v. Cassidy,* 474 F.2d 67, 71 n.7 (5th Cir. 1973).

■ Nonetheless, the question remains whether plaintiff Duncan may be certified as the representative of a class of former and present black associate staff employees at the University of Maryland at Baltimore for purposes of challenging the practices of that campus concerning recruitment, hiring, promotion, job assignment, and termination. *See generally* Complaint Part V. The five familiar requirements of subdivisions (a) and (b)(2) of F.R.Civ.P. 23 must be examined as to this proposed class.

The number of black employees on the associate staff at UMAB from 1974 to 1977 varied from 20 to 28. The number of black associate staff members who were terminated involuntarily totals five for the years 1974 to 1977. *See* Ex.C, Paper 29. No information is provided as to grievances concerning hiring, promotion, or job assignment. These numbers are not so large as to establish by themselves that the proposed class is so numerous that joinder of all members of the purported class is impracticable. *See* F.R.Civ.P. 23(a)(1); *Roman v. E. S. B., Inc.,* 550 F.2d 1343 (4th Cir. 1976); *Cypress v. Newport News General & Non-Sectarian Hospital,* 375 F.2d 648 (4th Cir. 1967). Decision on the numerosity requirement will depend on the extent of the common issues among the various associate staff employees.

For a class to be certified, there must be common questions of law or fact. *See* F.R. Civ.P. 23(a)(2). Other than the ultimate legal conclusion of liability *vel non,* plaintiff points to no common question of law which could warrant certification of the class. In contrast to the relatively settled substantive law on the merits, the facts presented on behalf of plaintiff Duncan and the others would be extremely diverse.

Duncan himself was personally recruited through word-of-mouth by a colleague already employed at the University. Duncan Dep. 44, 51, 92, Papers 26, 27 [hereinafter Duncan Dep.]. He was employed from February 1971 to June 1976 as Intercampus Coordinator for the UMAB campus, an associate staff position in the chancellor's office, where his job was to improve cooperation between Maryland colleges with a predominant or large black student body and the UMAB professional school placement program. *Id.* at 47–50. During this time his salary was increased from $16,500 to $20,400 per year. *Id.* at 88. Duncan sought no promotions as he already reported directly to the assistant to the Chancellor and no superior positions existed. *Id.* at 118–119. Although at one point Duncan asserted his job performance was "impeccable", *Id.* at 148, he does recognize the existence of a dispute between himself and his immediate superior, Mr. Roy Borom, Assistant to the UMAB Chancellor. *E.g., id.* at 203–209.

Mr. Borom, plaintiff's supervisor, apparently held plaintiff responsible for missing a deadline for filing a grant proposal. *See, e.g.,* April 4, 1975, Letter from Mr. Borom to plaintiff, Duncan Dep. Ex. 1; April 9, 1975 Letter from Mr. Borom to plaintiff, Ex. A, Paper 29. Defendants' memorandum summarizes Borom's unfiled deposition:

> "In his deposition, plaintiff's supervisor, Mr. Roy Borom, the Assistant to the Chancellor at UMAB, who also is black, listed various problems he had with plaintiff's performance. Plaintiff had demonstrated a lack of administrative leadership (Borom Depos. at 25); he had a continual problem of tardiness (*Id.* at 28); and manifested deficiencies in his interpersonal relationships with the deans of the professional schools (*Id.* at 29). As Mr. Borom testified, *Id.* at 28–29:
> 'Q. Okay. Is there any other thing that you would consider about Mr. Duncan, anything or problem that you

should term, other than what you have just said? Now, I take it that you considered the tardiness on his part at one point a problem. Am I correct?

'A. It was a continuing problem, not just at one point, but we dealt with it frequently and again, it was very clear and specific in what my expectations were as to arrival time and particularly arriving, and the number of hours they should have accounted during the day.

'Q. Now, was there any other problem?

'A. Other problem? Yeah, interpersonal relationships on the campus?

'Q. To wit?

'A. On the campus, our campus is organized in such a way that we have the six major academic, the history of those programs were that the school were autonimous (sic), so a dean on our campus of a particular school carries a significant role; and whatever we do on the campus—so that a relationship with those deans of any staff member is very crucial. And final analysis, if you aren't able to relate effectively with those deans, whatever program responsibility you carry suffers: and if you can't maintain and establish that confidence and trust to a large extent, you might as well pack up and forget about your program. So, that was a key area of concern on my part; not only for Mr. Duncan, but any staff I have responsibility for as well as my daily role.

'Q. Yes. You are implying that Mr. Duncan had a problem maintaining that, I take it?

'A. Yes.'

In a letter written by Mr. Borom to plaintiff on April 9, 1975, Mr. Borom mentions plaintiff's 'pattern of refusing to deal with facts when confronted with them and denial of responsibility for actions and behavior that produce negative results.' (See letter from Roy Borom to Roosevelt P. Duncan, dated April 9, 1975, attached hereto as Exhibit A.)

"Mr. Borom testified that he alone made the decision to terminate plaintiff. (Borom Depos. at 48) The precipitating act of plaintiff's termination was his failure to submit a proposal to the FUND for Improvement of Postsecondary Education in time to secure appropriate funding for a proposed consortium. As Mr. Borom testified, *Id.* at 45:

'A. It was at that point, that I guess, I had my greatest concern. And that was the key area because it did affect the reputation of the campus and as far as I am concerned, brought very negative responses from the community for the simple reason that that proposal did not go out on time; and it was my understanding that the noncampus people who were interested in that proposal were given or at least were the impression that the failure of that proposal had been prepared and taken to Washington by the deadline date, was a fault of our campus.

'Q. When in fact it was the fault of—

'A. Well, Mr. Duncan was the staff person given charge of it. He worked with community groups to develop the idea. Yes, cooperation, participation of our campus, so he was responsible for putting it together to make sure it was produced and delivered on time.' "

While plaintiff does have an explanation for his actions, Duncan Dep. 207–209, and he can perhaps point to persons in the university who took his side, *id.* at 187–189, the authority to make the decision rested with the chancellor of UMAB and his designee, apparently Mr. Borom. *See Rules on Associate Staff* 17–18; Borom Dep. 48.

The examples of alleged discrimination offered by plaintiff involve similarly unique personnel decisions between administrators at the University, *e.g.*, the choice of a white assistant dean at the law school at UMAB to become director of financial assistance at UMAB over a black assistant financial officer at UMAB. Duncan Dep. 95.

It is certainly conceivable that racial animus was a factor in plaintiff Duncan's termination or in the other personnel decisions involving associate staff at UMAB. Still, examination of plaintiff Duncan's factual claims and comparison of them to the purported class claims convince this court that the pertinent questions of fact are unique to each associate staff member and that there is no controlling common question of fact. For this reason, the plaintiff's motion for class certification must be denied.

Extended discussion of the three remaining conditions for class certification is not necessary although brief comments are appropriate. As to typicality and Rule 23(b)(2), if plaintiff Duncan or one of the other ambitious management level administrators were to establish liability, the court cannot at this time imagine a general form of injunctive relief that could deal adequately with these admittedly one-of-a-kind management positions. Finally, as to representativeness, it is apparent that plaintiff Duncan, who was himself recruited by word-of-mouth and who held a $20,000 a year staff position from which no promotion existed, is not a member of a class seeking to challenge a word-of-mouth recruiting system or denials of promotions. For these reasons also, the motion for class certification must be denied. *See, e.g., Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Sonsa v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *East Texas Motor Freight System, Inc. v. Rodriquez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

### III

### *Duncan Motion to Compel*

The plaintiff's motion (Paper 22) to compel answers to deposition questions and to otherwise make discovery seeks information concerning faculty and associate staff at campuses other than the UMAB. For the reasons explained above, this court has concluded that this litigation relates to the associate staff employees at UMAB. The court does not believe that information concerning faculty at any other campus is itself relevant or would lead to relevant evidence. To that extent, the motion to compel will be denied.

Discovery of information concerning associate staff on other campuses presents a closer question. If some UMAB employment practice of general application to associate staff employees were challenged here, then this information would be discoverable. However, plaintiff Duncan's personal complaint and the examples of discrimination against others proffered by him do not involve practices of general scope but involve only the specific employment decision affecting him and them. In these circumstances, the general pattern of decision by the person or persons who fired plaintiff is highly probative, relevant, and discoverable. The general pattern of decisions by others on the same campus is more removed, but apparently the defendant has not objected to its discovery. An objection has been made, however, to discovery of information from different campuses. Information concerning the general pattern of decisions at the University of Maryland Eastern Shore is remote from UMAB decisions and even remoter from the specific decision of Mr. Roy Borom, Assistant to the Chancellor, UMAB, to terminate plaintiff. The plaintiff has not proffered any explanation of how this information would be relevant to Duncan's case. For these reasons this court concludes that information concerning associate staff at the other campuses of the University of Maryland is not relevant or likely to lead to relevant evidence. The motion will be denied.

### IV

### *Defendant's Motion to Compel in C.A. M–76–1650*

The defendant's motion to compel discovery (Paper 24) seeks information concerning plaintiff Duncan's financial ability to represent the proposed class. This motion will be denied as moot.

### V & VI

### *Class Certification in C.A. M–74–826*

In *Rawlings v. Maryland*, C.A. M–74–826, the defendant has moved to strike the class

allegations (Paper 4), and the plaintiff has moved for certification of a class of all former, present, and future black applicants, faculty, and associate staff, at apparently all campuses of the University (Paper 6).

To the extent the proposed class includes persons other than faculty members at UMBC, the motion of plaintiff Rawlings, a former black instructor at UMBC, like the motion of plaintiff Duncan, must be denied because of the significant differences in the operation of the different campuses and as well, because faculty and associate staff are separate and distinct.

The question remains whether plaintiff Rawlings may be certified to represent a class of black faculty members at UMBC. The five requirements of Rule 23(a) and (b)(2) must be examined.

The number of black faculty members at UMBC was 21 at the time of the hearing on this motion. DMX 3. Blacks comprised 7.7% (21/272) of the active UMBC faculty. *Id.* This participation rate contrasts sharply with the national rates of 1% (1972) or 2% (1974). *Id.* At the time of the hearing 9 of the 21 black faculty members held Ph.D. degrees. *Id.* These numbers are not so large as to establish by themselves that the proposed class is so numerous that joinder is impracticable. *See* F.R.Civ.P. 23(a)(1); *Roman, supra; Cypress, supra.* Decision on the numerosity requirements will depend on the extent of the common issues among the various faculty members.

For a class to be certified, there must be a common question of law or fact. *See* F.R.Civ.P. 23(a)(2). The plaintiff points to no novel question of law or other legal question warranting class certification here.

Plaintiff Rawlings, was appointed to the faculty position of instructor in the Mathematics and Science Division, UMBC, in 1969. Baratz Aff. 1, Ex. A to Paper 4 [hereinafter Baratz Aff.]. An explicit condition of his appointment was that it "would be subject to [his] completing all requirements for [his] Ph.D." Letter of June 3, 1969 from Dr. Roberts to plaintiff,

attachment I to Baratz Dep. After three years of teaching at UMBC, in the spring of 1972, plaintiff Rawlings' performance was evaluated by the Division's Promotion and Tenure Committee. The Committee found that Rawlings' teaching was "somewhat below average", Baratz Dep. 2, and that he had not made any progress on his Ph.D., *Id.* It recommended unanimously that "Mr. Rawlings be given a one year terminal appointment as Instructor for the years 1972–73." *Id.* at 3. Among the Committee members signing the report was a black full professor whom the plaintiff seeks to represent as a member of his purported class. *Id.* The recommendation of the Division's Promotion and Tenure Committee was adopted by the UMBC Vice Chancellor for Academic Affairs and by the UMBC Chancellor. *Id.*

Subsequent to these events, Rawlings expressed an interest in becoming part of the administrative staff at UMBC, apparently as a member of the associate staff. *Id.* at 4. The one position that he specifically sought was filled by another black person. *Id.* Rawlings has based his personal complaint here on the termination of his faculty appointment. *See* Complaint Pt. V, at 4. He does not contend that he personally is a rejected applicant for an associate staff position for purposes of this case.

The plaintiff does not attempt to establish by example any common pattern of decisions by the Promotion and Tenure Committee of the Mathematics and Physics Division or by the UMBC Chancellor. Indeed, in Plaintiff's memoranda (Paper 6, 10), there is a dearth of specific factual information.

Consideration of plaintiff Rawlings' specific factual situation in the context of the general practices established by the *Statement of Policy on Appointments and Promotions* persuade this Court that the question of fact presented by Rawlings and by the other members of the purported faculty class are unique; each bearing on the qualifications, performance, and potential of the respective individual faculty members. For this reason, the motion for class certifica-

tion must be denied. Extended discussion of the remaining requirements for class certification is not necessary although brief comments are appropriate. As to typicality and Rule 23(b)(2), if plaintiff were to succeed on the merits, the court cannot now envision a common form of injunctive relief for Rawlings, who apparently has decided not to pursue his Ph.D., and for the hypothetical others who desire to continue academic careers. As to representativeness, the court observes that Rawlings' interest is hostile to the interest of the black full professor on the Promotion and Tenure Committee which unanimously recommended Rawlings' termination. For these reasons also, the motion for class certification will be denied. *See, e.g., Bailey, supra; Sonsa, supra; East Texas Motor Freight, supra.*

VII

The motion of plaintiff (Paper 14) to compel answer to interrogatories seeks answers to Interrogatories 2, 3, 4, and 5. *See* Paper 5.

■ As to Interrogatories 2 and 3 the defendants' answer provides almost two full pages of statistical information by race. They object to providing additional information by sex as irrelevant. *See* Paper 9, at 3–7. In the absence of any explanation by plaintiff of the relevance of information by sex, the motion will be denied.

■ Interrogatory 4 seeks the following information as to each faculty member on any campus who has been involuntarily terminated: race, sex, campus, date, and reason. Given this court's finding that for purposes of faculty employment decisions each campus is a separate unit, the motion must be denied as to campuses other than UMBC. Furthermore, this case now includes only plaintiff Rawlings' personal claim involving the Mathematics and Physics Division, which has its own Promotion and Tenure Committee separate from the other UMBC Divisions. This court believes that at most the information concerning faculty in that Division may be relevant to establishing a general pattern of decisions by the Committee. Such information might be relevant at trial. Accordingly, the motion to compel an answer to Interrogatory 4 is granted as to the years 1965 to date for the faculty in the UMBC Division of Mathematics and Physics, but it is otherwise denied.

As to Interrogatory 5, the answer compelled for Interrogatory 4 will supply the additional information sought in No. 5(c) to the extent this court finds proper.

VIII

The motion of defendant for a protective order (Paper 20) was filed on behalf of Dr. Roberts, the Dean of the Division of Mathematics and Physics at the time plaintiff Rawlings was terminated. His deposition will be relevant and crucial to plaintiff's case. Since the motion is predicated largely on the breadth of the subpoena, counsel should now be able to work out a suitable scope for the deposition in light of the rulings contained in this memorandum and order. The motion is denied.

IX

■ At the hearing on these motions on January 18, 1978, plaintiffs' counsel stated that it has been claimed in these cases that the defendants, State of Maryland, Governor, and the members of the University of Maryland Board of Regents, had personally engaged in racially discriminatory actions by establishing personnel policies relating to faculty and associate staff employees which were of inadequate specificity and language to prevent their application by the subordinate officials of the University of Maryland in a racially discriminatory manner.

Examination of the similar Complaints in these two cases, in particular Part V "Cause of Action", shows that such a claim has not been made in the present Complaints. These Complaints do allege generally discrimination in recruitment, Part V. a; educational qualifications, Part V. b; promotion, Part V. c; termination, Part V. d; and faculty teaching assignments, Part V. e.

The court finds no allegation that gives fair notice as to such a claim as expressed by counsel at argument. *See* F.R.Civ.P. 8.

Assuming *arguendo* that the statement of plaintiffs' counsel should be treated as a motion to amend the Complaints, this court concludes that justice requires that the amendment not be allowed. *See* F.R.Civ.P. 15. One reason is the plaintiffs' concession at the hearing that they had not pursued the grievance procedures generally available by the filing of an appeal to the overall University of Maryland hierarchy. This fact is important, not to demonstrate a failure by the plaintiffs to exhaust administrative remedies, but instead to demonstrate a lack of personal involvement by the overall hierarchy of the University of Maryland, under the administrative structure in existence, in the actions alleged to have been racially discriminatory as to these plaintiffs.

Another reason is plaintiffs' concession at the hearing that the general policies themselves are facially neutral as to race.

X

Accordingly, it is this 3rd day of February, 1978, ORDERED:

*In C.A. M–76–1650*

1. That the motion to consolidate (Paper 21) is DENIED.

2. That the motion for class certification (Paper 20) is DENIED.

3. That the motion of plaintiff to compel (Paper 22) is DENIED.

4. That the motion of defendant to compel (Paper 24) is DENIED as moot.

*In C.A. M–74–826*

5. That the motion of defendant to strike the class allegations in the complaint (Paper 4) is DENIED.

6. That the motion for class certification (Paper 6) is DENIED.

7. That the motion of plaintiff to compel (Paper 14) is GRANTED as to Interrogatory 4 for the years 1965 to date for faculty in the UMBC Division of Mathematics and Physics, but is otherwise DENIED.

8. That the motion for protective order (Paper 20) is DENIED.